The Honorable Jim Hill State Senator 100 Center Nashville, AR 71852-3821
Dear Senator Hill:
This is in response to your request for my opinion on various questions concerning the authority of the town council of an incorporated town and the subsequent actions of its mayor at a recent town council meeting. You report the facts as follows:
 In June of 2000, the town's electorate approved the issuance of bonds "for the purpose of acquiring, constructing and equipping sewer facilities" payable from a percentage of the collections of an increased sales tax. During a recent meeting of the town council, a motion was made to stop work on the sewer system project. The motion carried by a roll call vote of 3 "yeas" and 1 "nay" and one alderman being absent. The mayor immediately vetoed the decision.
Despite your reference to an "increased sales tax," an Affidavit of the Polk County Election Committee certifying the results of the election reports that the electors in the Town of Cove did not actually increase the tax, but instead pledged 70% of an existing sales and use tax to the capital improvement project. It is unclear from your request and the supporting information you have supplied whether the bonds were ever issued.
Against this backdrop, you have posed the following questions:
 1. Can three (3) members of a five (5)-member town council by an assenting motion and vote actually stop the work on a sewer system project that received prior approval by the people?
2. Can the town's mayor veto the action?
 3. Does the mayor have the authority to request additional funds through grants and loans from the USDA, (for example, to add funds to the project), without bringing the question before the town council for a vote?
RESPONSE
With respect to your first question, assuming the electorate pledged 70% of sales tax revenue to finance the project pursuant to Ark. Const. amend. 62, I believe the electorate would probably need to authorize any termination of the project and reallocation of the taxes levied to support the project. However, only a finder of fact could definitively answer this question. I suggest town officials seek the counsel of the city attorney with respect to these factual issues. In light of my response to your first question, your second question may well be moot. However, assuming it is not, A.C.A. § 14-45-105 (Repl. 1998) affords the mayor of an incorporated town a limited power to veto otherwise legitimate acts of the town council. With respect to your third question, I strongly doubt that the mayor of an incorporated town is empowered independently to negotiate and conclude a capital-improvement financing arrangement with the USDA or any other federal agency.
Question 1: Can three (3) members of a five (5)-member town council by anassenting motion and vote actually stop the work on a sewer systemproject that received prior approval by the people?
I assume the project in question was to be funded by bonds issued pursuant to Ark. Const. amend. 62, with the repayment to be funded at least in part by the levy of a sales and use tax pursuant to A.C.A. §§26-75-201 et seq. (Repl. 1997 Supp. 2001), 26-75-301 et seq. (Repl. 1997 Supp. 2001) and/or The Local Government Bond Act of 1985, A.C.A. § 14-164-301 et seq. (Repl. 1998 Supp. 2001). Upon approval of the electorate, these subchapters of the Code authorize the issuance and repayment of bonds, secured by pledges of sales tax revenues, for the purpose of constructing, acquiring or equipping "capital improvements of a public nature." Ark. Const. amend. 62, § 1(a). Both A.C.A. §§26-75-203(3)(G) and 26-75-303(3)(G) define "capital improvements of a public nature" as including "sewerage facilities."
In Roberts v. Priest, 341 Ark. 813, 818, 20 S.W.3d 376 (2000), the Arkansas Supreme Court confirmed that once the electors of a city or county have approved a sales or use tax to finance capital improvements, the tax can be abolished only by vote of the people and only then if the tax revenues are not pledged as security for outstanding bonds:
 City and county legislative bodies may levy sales and use taxes, but the taxes must be approved by the voters in an election. See Ark. Code Ann. § 26-74-201 et seq.; § 26-74-301 et seq.; § 26-74-401; § 26-75-201 et seq.; § 26-75-301 (Repl. 1997 Supp. 1999). Similarly, an election of qualified voters is necessary to abolish a local sales and use tax; but a city or county may not repeal, abolish, or reduce any local sales and use tax, even by election, if that tax was levied pursuant to these provisions and was pledged as security for the payment of lease rentals or bonds so long as the leases are effective or the bonds are outstanding. Ark. Code Ann. §§ 26-74-210; 26-74-217; 26-74-310; 26-75-210; 26-75-215; 26-75-310 (Repl. 1997).
Accord Hasha v. City of Fayetteville, 311 Ark. 460, 463-64,845 S.W.2d 500 (1993). In addition, the Code provides that any abolition of a voter-approved sales or use tax must be undertaken observing the same procedures as those observed in initially approving the tax. A.C.A. §§26-75-210(a) and 26-75-310(a), referencing the procedures for adoption set forth at A.C.A. §§ 26-75-208 and 26-75-308. Finally, as a matter of constitutional law, any unabolished tax imposed to finance the construction of sewerage facilities must be used only for that purpose:
 No tax shall be levied except in pursuance of law, and every law imposing a tax shall state distinctly the object of the same; and no moneys arising from a tax levied for one purpose shall be used for any other purpose.
Ark. Const. art. 16, § 11.
Although only a court can determine the specific facts to which the foregoing principles apply, it appears that the town council did not vote to abolish the existing sales tax, but rather only to stop work on the project. If so, a court might characterize the council's action as an attempted rescission of the voters' pledging 70% of sales tax revenues to secure bonds devoted to the exclusive purpose of completing the project. If this is in fact what occurred, I believe a court might conclude that the council's action was ultra vires insofar as the voters were misled regarding the purpose to which the bond revenues — and, by extension, the tax — would be put. I am unaware of any support for the proposition that a town council is empowered by majority vote to abandon work on a capital improvement project that the voters have indicated should ultimately be financed by all or part of an existing sales or use tax.
In my opinion, if the only pertinent fact were that the voters modified the purpose of the tax by pledging 70% of tax revenues to secure bonds financing the project, this action would be tantamount to partially abolishing an old tax and to newly "imposing a tax" likewise subject to the Article 16, § 11 requirement that the tax be used only for the particular purpose recited. See Western Foods, Inc. v. Weiss,338 Ark. 140, 148, 992 S.W.2d 100 (1999) (acknowledging that changing the terms of an Amendment 62 tax, such as the scope of exemptions, would require new voter approval unless the change were effected by the state legislature). Moreover, given that an Amendment 62 tax can be imposed only by vote of the people, I believe that authorizing its diversion to some other purpose can likewise only be effected by popular vote, and only then if the bonds have not yet been issued. This conclusion seems to me consistent with the following excerpt from A.C.A. § 26-75-310:
 In any city in which a local sales and use tax has been adopted in the manner provided for in this subchapter and all or any portion pledged to secure the payment of lease rentals or bonds as authorized by this subchapter, that portion of the tax pledged to lease rentals or bonds shall not be abolished so long as the lease is effective or any of the bonds are outstanding. The city may abolish all or that portion of the sales and use tax that is not pledged to lease rentals during which the lease is effective or to outstanding bonds after, and only after, an election called by action of its governing body or by a petition of the qualified voters in the city.
Accord Roberts, supra.
In short, if the bonds have not yet been issued, I believe the council's authority is limited to referring to the people the question of whether to abandon the project and to reallocate the pledged tax revenues to some other purpose. If the bonds have been issued, I believe neither the town council nor the electors can suspend collection of the pledged tax, which as a matter of contract law has been committed to repayment of the outstanding bonds. Moreover, again as a matter of contract law, if the trust indenture were in any way to commit project revenues to repayment of the bonds, it would appear that neither the town council nor the electors could suspend completion of the project and divert bond revenues elsewhere. Finally, to the extent that the people voted to pledge tax revenues to retire bonds used exclusively to finance the project, it would appear that the town council would be precluded from unilaterally deciding to use the bond revenues for another purpose. However, as these speculations suggest, various contingencies might bear on the question of what actions ultimately might be permissible. Only a finder of fact can determine the propriety of what occurred in this case. I advise consulting with the town's local counsel regarding such factual matters.
Question 2: Can the town's mayor veto the action taken?
This question would obviously be moot if the town council's action were itself ultra vires. However, I will note for your information that a town mayor's powers, including the power of veto, are set forth in the following statute:
 (a) The mayor in incorporated towns shall be ex officio president of the town council, shall preside at its meetings, and shall have a vote when the mayor's vote is needed to pass any ordinance, bylaw, resolution, order, or motion.
 (b)(1) The mayor in these towns shall have the power to veto, within five (5) days, Sundays excepted, after the action of the council thereon, any ordinance, resolution, or order adopted or made by the council, or any part thereof, which in his judgment is contrary to the public interest.
 (2)(A) In case of a veto, the mayor shall, before the next regular meeting of the council, file a written statement of his reasons for the veto in the office of the town recorder-treasurer, to be laid before the meeting.
 (B) No ordinance, resolution, or order, or part thereof, vetoed by the mayor shall have any force or validity unless, after the written statement is laid before it, the council shall, by a vote of two-thirds (2/3) of all the aldermen elected thereto, pass it over the veto.
A.C.A. § 14-45-105 (Repl. 1998).
Question 3: Does the mayor have the authority to request additional fundsthrough grants and loans from the USDA, (for example, to add funds to theproject), without bringing the question before the town council for avote?
In addressing your question, I am guided by the following recent pronouncement from City of Cave Springs v. City Of Rogers, 343 Ark. 652,657, 37 S.W.3d 607 (2001):
 [I]n Stilley v. Henson, 342 Ark. 346, 355, 28 S.W.3d 274, 279 (2000), this court recognized the limited powers bestowed on municipal corporations:
 Municipal corporations are creatures of the legislature and as such have only the power bestowed upon them by statute or the Arkansas Constitution. Jones v. American Home Life Ins. Co., 293 Ark. 330, 738 S.W.2d 387 (1987). It is well settled that municipal corporations have no inherent powers and can exercise only (1) those expressly given to them by state statute or the Arkansas Constitution, (2) those necessarily implied for the purposes of, or incident to, the express powers, and (3) those indispensable, not merely convenient, to their objects and purposes. Cosgrove v. City of West Memphis, 327 Ark. 324, 938 S.W.2d 827 (1997). Finally, any substantial doubt about the existence of a power in a municipal corporation must be resolved against it. Id.; City of Little Rock v. Cash, 277 Ark. 494, 644 S.W.2d 229 (1982); Town of Dyess v. Williams, 247 Ark. 155, 444 S.W.2d 701 (1969).
 . . . As far back as 1878, this court has held that counties, cities, and towns, are municipal corporations. See Roberts v. Watts, 263 Ark. 822, 568 S.W.2d 1 (1978); Eagle v. Beard, 33 Ark. 497 (1878). This holding was reiterated in City of Hot Springs v. Gray, 215 Ark. 243, 219 S.W.2d 930 (1949).
As reflected in my response to your previous question, the general statutory powers of the mayor of an incorporated town are quite limited. In addition to affording the mayor the qualified veto power discussed above, A.C.A. § 14-45-105(a) designates the mayor "ex officio president of the town council," whose only policy-making role is to vote as a council member in the event of a tie, and only then if his vote would result in the passage of an ordinance, bylaw, resolution, order or motion. In addition, A.C.A. § 14-45-106(a) affords the mayor of an incorporated town, "within the town, all power and jurisdiction of a justice of the peace in all civil or criminal matters arising under the laws of the state, to all intents and purposes whatever." In my opinion, nothing in these statutes expressly affords the mayor of an incorporated town the power independently to negotiate funding for capital improvements through the USDA.
I further doubt that allowing the mayor to negotiate with the USDA could be characterized as necessarily implied or indispensable, as opposed to merely convenient, to the town's governmental operations. See Burke v.Elmore, 341 Ark. 129, 14 S.W.3d 872 (2000) (in absence of enabling statute, ordinance purporting to grant purchasing and contracting power to mayor of city of the second class invalid). Consequently, the decision to pursue a particular avenue of grant or loan financing for capital improvements would properly appear to lie with the town council and, if the financing involved a loan to be repaid with general or tax revenues, with the electorate.
Assistant Attorney General Jack Druff prepared the foregoing, which I hereby approve.
Sincerely,
MARK PRYOR Attorney General
MP:JD/cyh